**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HIGHTOWER HOLDING, LLC, and | § | |
| HIGHTOWER ADVISORS, LLC, | § | |
| | § | Case Number:_____ |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | |
| | § | |
| FAIZA KEDIR, | § | |
| | § | |
| *Defendant*. | § | |

<u>**ORIGINAL COMPLAINT AND APPLICATION FOR INJUNCTIVE RELIEF**</u>

Plaintiffs Hightower Holding, LLC and Hightower Advisors, LLC (collectively, "Hightower" or "Plaintiffs"), by their undersigned counsel, hereby file this Original Complaint and Application for Injunctive Relief against Defendant Faiza Kedir ("Kedir" or "Defendant") and state as follows:

**I. NATURE OF ACTION**

1.      Kedir was employed by Hightower as a financial advisor and member of its Landsberg Bennett Private Wealth Management team ("LBPWM") in Punta Gorda, Florida until her sudden resignation on September 22, 2023.  Hightower is a registered investment adviser ("RIA") firm that provides financial advice to its clients nationwide through teams like LBPWM. Hightower's team at LBPWM employs proprietary investment strategies developed and honed internally through years of research and planning.

2.      Shortly before her resignation, Kedir collected information about these investment strategies from internal Hightower sources and emailed it to a personal email account.  The information Kedir removed from Hightower's secure systems includes, but is not limited to: (i) detailed pricing, performance, and risk data for Hightower/LBPWM proprietary investment

strategies; (ii) the identification (and strategic allocation) of specific investment products that have passed Hightower's due diligence process for inclusion in these proprietary investment strategies; and (iii) confidential customer information protected under federal law, including account numbers. Essentially, Kedir walked away from Hightower carrying its "secret sauce." She has since become affiliated with a Hightower competitor—Steward Partners Investment Solutions, LLC ("Steward")—and is in a position to use these materials to directly and improperly compete with Hightower. Hightower has demanded the return of this information, but Kedir has refused.

3.      Since becoming affiliated with her new firm, Kedir has used this information to improperly communicate with and solicit Hightower customers to transfer their accounts to Steward.

4.      Kedir has caused harm to Hightower by, among other things, (a) misappropriating Hightower's trade secrets in violation of the Defend Trade Secrets Act, (b) breaching valid and enforceable post-employment restrictive covenants, and (c) interfering with Hightower's current and prospective business relationships. Consequently, Hightower seeks damages resulting from these actions. Additionally, Kedir's malfeasance is ongoing and constitutes a continuing and imminent threat of irreparable harm to Hightower.

5.      Thus, Hightower seeks injunctive relief from this Court: (i) enjoining Kedir from further breaches of her contractional obligations; (ii) requiring Kedir to return all confidential information and trade secrets to Hightower; and (iii) prohibiting further use by Kedir of Hightower's trade secret and confidential information. This preliminary injunctive relief is intended to maintain the status quo until Hightower's ultimate claim for damages can be heard.

## II. THE PARTIES

6.      Plaintiff Hightower Advisors, LLC is a limited liability company headquartered in Illinois. Its sole member is Hightower Holding, LLC.

7.     Plaintiff Hightower Holding, LLC is a limited liability company organized under the laws of the State of Delaware and headquartered in Illinois.  Its members are Hightower Intermediate, LLC, a Delaware limited liability company, and Hightower Intermediate Corp., a Delaware corporation.

8.     Defendant Faiza Kedir is an individual who resides in the state of Florida.

### III. JURISDICTION AND VENUE

9.     This Court has original jurisdiction over this action pursuant to the provisions of 28 U.S.C. § 1331 in that this matter is a civil action arising under the Constitution, laws, or treaties of the United States.  This action is based on 18 U.S.C. §§ 1836 *et seq.*, also known as the Defend Trade Secrets Act (the "DTSA").  This action is also based on 18 U.S.C. §§ 1030 *et seq.*, also known as the Computer Fraud and Abuse Act (the "CFAA").   Additionally, this Court has supplemental jurisdiction over Plaintiffs' state law and other claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this district.  Paragraph 10(e) of the Hightower Holding, LLC Standard Protective Agreement (the "Agreement"), which was executed by Kedir, states that "As to any suit or action arising under or related to this Agreement, Employee and the Company (i) agree that the suit or action must be brought and litigated in, and decided by, the state or federal courts in Chicago, Illinois; [and] (ii) waive any argument that personal jurisdiction or venue in any such court is improper, inappropriate or inconvenient [...]."[1]

### IV. FACTS COMMON TO ALL COUNTS[2]

#### A.     Hightower Protects its Trade Secrets and Confidential Information

11.     Hightower is an investment advisory and wealth management firm that, among

---

[1] The Agreement is attached as **Exhibit 1**.
[2] The facts stated in paragraphs 11-32 and 40-47 are verified by the affidavit of Michael Landsberg, which is attached as **Exhibit 2**.

other things, provides investment, financial, and retirement planning services to individuals, foundations, and family offices. The LBPWM team joined the Hightower network in or around October of 2021. At that time, LBPWM managed about $1 billion in client assets.

12. Hightower's LBPWM team has created multiple unique model portfolios tailored to the diverse needs of its client base, including, for example, a dividend strategy portfolio, a small-mid cap strategy, an international strategy, and a growth strategy portfolio. Very few registered investment adviser ("RIA") firms in LBPWM's geographic area have small-mid cap or international strategies. These portfolio strategies, and the investments that comprise them, are Hightower's "secret sauce." These strategies are unique to Hightower, and developed over the course of years through hours of due diligence and research, including by meeting with key decision makers before deciding to approve an investment for inclusion in a strategy. These strategies are marketed to clients and prospective clients, and are not easily recreated or duplicated by competitive firms. They are a key part of Hightower's competitive advantage.

13. To protect itself from unfair competition, Hightower makes substantial efforts to ensure the confidentiality of information concerning its clients and strategies. In addition to the contractual safeguards set forth in the Agreement, Hightower requires its employees to abide by employee policies and procedures that specifically treat client and proprietary information as Hightower property and that prohibit the use or disclosure of this information other than in connection with Hightower's business. Moreover, Hightower maintains policies safeguarding client and proprietary information to protect clients' privacy interests and keep this information strictly internal so that it does not fall into the hands of Hightower's competitors. These policies prohibit providing client and proprietary information to any third party, or otherwise removing this

information from Hightower.  Disclosure of Hightower's client and proprietary information to competitors would give those competitors an unfair advantage in soliciting Hightower's clients.

14.     Hightower exerts significant efforts to maintain the secrecy and confidentiality of Hightower's client records, including information identifying its clients.  Its Punta Gorda offices are locked and secure during non-working hours and a security firm monitors the building.  The computer system is password-protected and only authorized Hightower personnel have access to account information.  The highly sensitive and confidential client information that Hightower is required to maintain is kept secure on the Hightower network.  Kedir was undoubtedly aware of the steps taken by Hightower to protect its client and proprietary information.

15.     Hightower derives actual and potential economic value from its client and proprietary information in part because this information is not generally known to and not ascertainable through proper means by other persons who can obtain economic value from its disclosure or use.  Hightower goes to great lengths and significant expense to maintain and grow its book of business, establish client relationships and trust, and acquire/develop the confidential information it seeks to protect. These efforts include marketing, training its employees, conducting extensive research and due diligence, and providing services that best fit the needs of its clients, all of which take time and money to accomplish.

16.     Hightower's customer and proprietary information is also protected by federal law and industry standards.  For example, SEC Regulation S-P, 17 CFR § 248 *et seq.*, provides for specific conditions under which investment advisers like Kedir are permitted to disclose nonpublic personal information about clients.  Generally, unless Kedir sought and received approval for the specific disclosure from the client(s) at issue, such disclosure is prohibited.

17.     Kedir is also a Certified Financial Planner ("CFP") and as such is required to adhere to the CFP Code of Ethics and Standards of Conduct for Certified Financial Planners ("CFP Code"),[3] which contains unambiguous directives on the protection of client information.  The CFP Code mandates that Kedir "must keep confidential and may not disclose any non-public personal information about any prospective, current, or former Client […]."  CFP Code, § A(9)(a).  Moreover, the CFP Code requires that Kedir not use any non-public personal information about a client for her benefit, and that Kedir take reasonable steps to protect the security of non-public personal information about a client, including electronically stored information.  CFP Code, § A(9)(b), (c).  By removing documents containing client account numbers and account allocations/values from Hightower's secure systems, Kedir violated these key rules of the CFP Code.

**B.     Kedir's Employment with Hightower and Pre-Resignation Conduct**

18.     Kedir accepted an offer of employment from Hightower on or around November 15, 2021 and began working with Hightower's LBPWM team in Punta Gorda, Florida.[4]  Kedir served as a director of business development and, eventually, a financial advisor with LBPWM.

19.     When she came to Hightower, Kedir did not have experience developing investing or financial planning strategies on her own.  While Kedir did have some pre-existing client relationships, her primary role was business development.  Recently, Kedir approached the LBPWM partners seeking the opportunity to increase her income after a few years of average client development results.  At her request, she was given the opportunity to manage additional client relationships.  Nevertheless, due to her business development role, Kedir had access to all

---

[3] Relevant portions of the CFP Code are attached as **Exhibit 2A**.
[4] The signed offer letter is attached as **Exhibit 2B**.

of LBPWM's clients and their associated confidential information, as well as access to the proprietary investment strategies implemented by Hightower's LBPWM team.

20. Kedir, with Hightower's support, earned the CFP designation in 2021 or 2022. Among other things, Hightower supported Kedir's pursuit of the CFP designation through coursework, a CFP preparation course, hotel accommodations for the same, and time off to study. In January of 2023, Hightower handed Kedir the accounts serviced by a retiring LBPWM advisor, increasing her book of business by about 30%. At the time of her resignation, Kedir serviced or was the lead advisor for more than $150 million in assets under management.

21. In the months leading up to her resignation, Kedir was noticeably absent from Hightower's LBPWM office and was noticeably avoiding scheduling regular client and prospect calls, meetings, and periodic reviews. This was a clear abdication of her responsibilities as director of business development to not focus her efforts to develop business on behalf of Hightower over this period of time while being paid to do so. When questioned, Kedir would respond that she was waiting until the fall to conduct these important client and prospect contacts. Kedir resigned from Hightower on September 22, 2023.

22. Following her resignation, Hightower performed a review of Kedir's computer and email activity to ensure the security of Hightower's confidential information. During the course of this review, Hightower discovered that Kedir emailed Hightower's confidential and trade secret information—including the allocation strategies that make up its "secret sauce"—to a personal email account. In addition, Hightower has discovered that Kedir emailed confidential client information, including account numbers and other private financial information, to that same personal email address.

23.     Specifically, Kedir requested a list of alternative investments and mutual funds held by Hightower/LBPWM in its models from one of LBPWM's portfolio analysts.  Kedir received this information via her LBPWM email on August 17, 2023, and immediately forwarded it to a personal email account.  Kedir resent the same information to a personal email account on August 22, 2023, well after working hours.[5]  On August 21, 2023, Kedir sent an email to her personal email account containing detailed holdings information for one of the clients she serviced on behalf of Hightower.[6]  This client was invested in the four most popular Hightower/LBPWM strategies on an equal basis—25% each.  This information would allow Kedir to recreate each of these strategies with relative ease.    Additionally, this information includes confidential client information protected by federal law, including account numbers, account values, and gain/loss data.

24.     Also on August 22, 2023, Kedir sent portfolio strategy simulations for four of Hightower/LBPWM's most implemented strategies to her personal email account.[7]  These simulations are proprietary to Hightower, are built by its portfolio team, and are used by Hightower to market investment strategies to clients and potential clients.  Among other things, these simulations show historical performance data, specific and general asset allocation information, risk information, and expense information.   Kedir was not part of the process of developing these strategies, and does not have the training or experience to create comparable investment strategies independently.

25.     In total, over the course of a few days, mere weeks before her resignation, Kedir removed: (i) confidential client information; (ii) client data that could be easily used to recreate

---

[5] These emails are attached as **Exhibit 2C**.
[6] This email, dated August 21, 2023, is attached as **Exhibit 2D**.
[7] This email, dated August 22, 2023, is attached as **Exhibit 2E**.

Hightower's most popular proprietary investment strategies; (iii) detailed information regarding alternative investments and mutual funds used in other Hightower proprietary investment strategies; and (iv) detailed simulations of four key Hightower proprietary investment strategies which include a myriad of relevant confidential data.

26.     None of this information should have left Hightower's secure servers, and Kedir was not permitted to send this information to her personal email account weeks before her resignation.  This information allows Kedir to target Hightower clients, and to target them using Hightower's own proprietary investment strategies.

**C.     Kedir's Post-Resignation Conduct**

27.     Kedir turned in her resignation letter on September 22, 2023, through which she stated her intention to commence affiliation with Hightower competitor Steward.[8]  At the time, Hightower was unaware that Kedir had absconded with the client and confidential information described above.

28.     Since resigning from Hightower, Kedir has been actively soliciting clients and moving their business to Steward in violation of the Agreement.  The confidential and proprietary information removed by Kedir before her resignation allows her to more easily market herself to Hightower clients and, potentially, to market against Hightower's proprietary strategies. Hightower has demanded the return of this information via letter to Kedir's counsel, but Kedir has refused to comply.[9]

29.     It is also clear, from Hightower's discussions with its clients, that Kedir is in violation of the Agreement, wherein she agreed not to "contact, request, solicit or encourage" any Hightower clients to move their business or "otherwise interfere with, reduce, or harm the

---

[8] A true and correct copy of Kedir's resignation letter is attached as **Exhibit 2F**.
[9] A true and correct copy of the October 4, 2023 demand letter is attached as **Exhibit 3**.

Company's relationships" with such persons.  Hightower has consistently been informed by clients that Kedir has contacted them by phone and/or email to ask them to move their accounts to Steward.  At least one such client has informed Hightower that Kedir notified them of her impending resignation and move to Steward while Kedir was still employed by Hightower.

30.     According to public regulatory records, Kedir's registration with Steward commenced on October 3, 2023.  Before that date—but after her resignation from Hightower—Kedir apparently contacted the attorney for one of Hightower's clients and requested that the attorney provide her with the client's trust documents.  At the time she made this request, she was not affiliated with Hightower and was not registered with the SEC through any investment advisory firm according to public disclosures.  Nevertheless, she attempted to collect confidential information about this client, evidently under false pretenses—the attorney forwarded the requested information to Kedir's Hightower email address.[10]

31.     Hightower has also received reports that Kedir has contacted at least one former Hightower portfolio manager to recruit him to join her at Steward, presumably for his ability to interpret and help her implement Hightower's proprietary investment strategies.  Kedir's lack of training and experience creating and implementing these strategies is evident from her attempt to hire this former Hightower employee who was instrumental in the creation and day to day management of these strategies.  Coupled with her removal of Hightower's confidential and trade secret information, it is plain to see that Kedir's plan to compete with Hightower revolves around her improper attempts to make use of Hightower's confidential, proprietary, and trade secret strategies

---

[10] A true and correct copy of the email dated September 25, 2023 is attached as **Exhibit 2G**.

32.     Finally, Kedir has published misleading and/or untrue statements regarding her own credentials and Hightower's business practices.  Notably, Kedir's public LinkedIn profile incorrectly states that she has been a CFP for more than eleven years.  She earned that designation a little over a year ago.  Kedir has also made statements disparaging Hightower and its business practices in a Steward press release that has been widely published.  A release published by the Associated Press quotes Kedir as stating that she had been searching for outside employment "for the last few years" and noting that she "will have the opportunity to offer fiduciary advice" to her clients.[11]   The clear—and inaccurate—implication of this statement is that Hightower did not provide her the opportunity to offer fiduciary advice.  Both Hightower and Steward are bound by fiduciary obligations under federal law and SEC regulations.  She also attempted to differentiate Steward from Hightower by alleging Steward is "focused on the future," will provide her "the ability to market" her own firm with Steward support and resources, and will allow her "to maximize the growth potential" of her business.   In each instance, Kedir is disparaging Hightower's business and damaging its reputation.

33.     Kedir has also been directly and indirectly communicating false and misleading information to Hightower clients about Hightower/LBPWM.[12]   Among other things, Kedir is informing Hightower clients that LBPWM has been sold and is no longer being run by Michael Landsberg and Lew Bennett.  These clients have expressed confusion about the status of LBPWM and their LBPWM accounts.  In the financial services industry, client trust in, and relationship with, their financial advisors is of paramount importance.

---

[11] A true and correct copy of the Associated Press release is attached as **Exhibit 2H**.  Identical language can be found in releases published by numerous industry sources, including Investment News, Business Insider, and WealthManagement.com's RIA Roundup.

[12] The facts stated in paragraphs 33-39 are verified by the affidavit of Debra Cooper, which is attached as **Exhibit 4**.

34.     LBPWM is a Hightower affiliate, and has been since the fourth quarter of 2021. Since becoming a Hightower affiliate, Hightower has provided LBPWM with significant support, including business development, marketing support, technology, investment management resources, compliance, accounting, and human resources.  However, LBPWM has retained its autonomy, brand, and strategic control.  Michael Landsberg and Lew Bennett still run LBPWM. Michael Landsberg is LBPWM's Chief Investment Officer and leads LBPWM's investment committee.  Lew Bennett leads LBPWM's retirement planning activities.  Kedir is aware of the relationship between Hightower and LBPWM—she had been a Hightower employee working in its LBPWM office for nearly two years at the time of her resignation.

35.     On October 25, 2023, LBPWM COO Debra Cooper received a phone call from Client "A".  Client "A" told her that she had been informed by one of Kedir's relationships that LBPWM had been sold and that it was not being run by Michael Landsberg and Lew Bennett. LBPWM has received similar reports from other clients.

36.     For example, on October 23, 2023, LBPWM advisors met with Client "B", a family, in the Hightower/LBPWM offices.  Client "B" told LBPWM that they had been informed by one of Kedir's relationships that LBPWM had been sold.  Client "B" also questioned who was managing their portfolio.

37.     On October 24, 2023, LBPWM received an email from Client "C" questioning LBPWM's relationship with Hightower.  Client "C" was under the impression that Hightower had bought out LBPWM and was "puzzled" about what had happened.

38.     Kedir's statements that LBPWM is not being run by Michael Landsberg and Lew Bennett are inaccurate.  Kedir's statements that LBPWM was sold, including any insinuation that

the sale/change of control was recent, are inaccurate. Kedir is fully aware of the operations and management of LBPWM and fully aware that such statements are inaccurate.

39.     Unfortunately, Kedir's statements have led to confusion and uncertainty from Hightower clients, including those discussed above. Such uncertainty is severely damaging to Hightower's client relationships. While some clients have reached out seeking clarity from LBPWM, there are likely many others who received this false information from Kedir and elected to transfer their accounts without ever seeking confirmation or clarification of her statements from LBPWM.

40.     As of her resignation, Kedir was the lead advisor to or had a substantial relationship with client accounts totaling more than $150 million in assets under management. As of today's date, she has moved more than $50 million in assets to her new employer representing approximately $450,000 in annual revenue. These relationships also represent incalculable future harm to Hightower in the form of lost goodwill and lost sources of potential referrals. Kedir's ongoing actions and disregard for her obligations to Hightower threaten the remaining $100 million plus in assets, in addition to the confidentiality of Hightower's proprietary, trade secret, and sensitive client information.

41.     It is critical that this Court grant injunctive relief stopping Kedir from retaining and misusing Hightower information, and improperly diverting this business from Hightower. If these remaining clients are diverted away, Hightower will lose these relationships for years into the future. The damages that flow from such an occurrence are huge and extremely difficult to quantify. So too is the negative impact and loss of goodwill, referral sources, confidentiality of client information, and office stability should Kedir remain unchecked.

**D.      Kedir's Agreement with Hightower**

42.      At the commencement of her Hightower employment, Kedir entered into multiple enforceable agreements which dictated the terms of her employment and laid out post-employment obligations which she is currently violating.  Among other agreements with Hightower, Kedir signed the Standard Protective Agreement at the start of her Hightower employment on November 15, 2021.[13]

43.      Kedir received valuable consideration in exchange for signing the Agreement.  She received specialized training, licensing, and access to Hightower client accounts (and their associated confidential information) solely and exclusively because of her employment with Hightower.  Among other things, Hightower sponsored Kedir in obtaining her CFP designation and handed Kedir a retiring advisor's book of business.  Hightower paid Kedir's salary and benefits, and a significant number of the clients she serviced were developed by other Hightower advisors or otherwise assigned to Kedir.  Kedir also benefitted from Hightower's marketing campaigns and its reputation in the financial services industry.

44.      The Agreement contains restrictive covenants related to confidential information and post-termination interactions with Hightower clients.  By signing the Agreement, Kedir acknowledged that she was prohibited from retaining any Hightower client information and from soliciting any of Hightower's clients for a period of one year should she cease to be employed by Hightower.  Specifically, she agreed to the following:

- Employee acknowledges that the Confidential Information is vital, sensitive, confidential and proprietary to the Company, is kept under tight security with the Company, and cannot be readily ascertained from publicly-available materials or from materials properly available to the Company's competitors.  Employee further acknowledges that the confidentiality of the Confidential Information is critical to the Company's competitive advantage in the industry and would be of demonstrable value to a competitor and corresponding detriment to the Company

---

[13] Ex. 1.

if it were to become known to a competitor or otherwise used or disclosed in violation of this Agreement. Ex. 1 at ¶3(b).

- At all times during and after Employee's employment with the Company, Employee shall (i) hold the Confidential Information in the strictest confidence and take all reasonable precautions, including following all Company policies and directives, to prevent the inadvertent disclosure of Confidential Information to any unauthorized individual or entity; and (ii) not disclose or otherwise use the Confidential Information in any manner or medium whatsoever, except as required to perform Employee's duties for the Company or with the Company's prior written consent. Ex. 1 at ¶3(c).

- [D]uring Employee's employment with the Company and for a period of twelve (12) months immediately following the voluntary or involuntary termination of Employee's employment for any reason (the "Restricted Period"), Employee shall not, directly or indirectly, on Employee's own behalf or on behalf of any other Person, except on behalf of the Company in furtherance of Employee's proper duties to the Company: (a) contact, request, solicit or encourage, or direct any Person to contact, request, solicit or encourage any of the Company's [...] Customers or Prospective Customers (the "Protected Business Contacts"), for the purpose of (i) providing said Protected Business Contacts any products, services and/or advice that are the same as or similar to any of the products, services and/or advice provided by the Company, (ii) entering into any agreement, engagement, or opportunity to provide any such products, services and/or advice to said Protected Business Contacts; or [...] (c) otherwise interfere with, reduce, or harm the Company's relationships with such Protected Business Contacts [...]. Ex. 1 at ¶4.

- During the Restricted Period, Employee shall not, directly or indirectly, on Employee's own behalf or on behalf of any other Person, except on behalf of the Company in furtherance of Employee's proper duties to the Company accept or receive any transfer of assets, accounts or confidential or personal information related to any Protected Business Contact. Ex. 1 at ¶5.

- Employee acknowledges and agrees that all lists and information about any of the Company's Customers and Prospective Customers (including, without limitation, the names, addresses, telephone numbers, and email addresses of all such Persons) are and shall remain the exclusive property of the Company, regardless of whether such information was developed, purchased, acquired, or otherwise obtained by the Company or Employee. [...] Employee shall not remove or transfer from the Company's premises and control any information, documents, records, lists, electronic files, paper files, notebooks, correspondence, reports, video or audio recordings, computer printouts, computer programs, computer software, electronic mail, price lists, microfilm, drawings or other similar documents or media belonging to the Company, including without limitation those containing Confidential Information, including any copies thereof, whether prepared by Employee or others [...]. Ex. 1 at ¶6.

- Employee will not make any disparaging, untrue, or misleading written or oral statements about or relating to the Company or its services or products (or about or relating to any Company officer, board member, agent, employee, or other person acting on the Company's behalf) or any written or oral statement having the intended or foreseeable consequence of casting any such persons in a bad light, or disparaging its or their business practices, competence, reputation, products, services or skills […]. Ex. 1 at ¶7.

45.     Moreover, in the Agreement, Kedir agreed that the injunctive relief sought by Hightower would be appropriate to prevent irreparable harm that would be caused by breaches of any of the above:

- It is agreed that any breach or anticipated or threatened breach of any of Employee's covenants contained in this Agreement will result in irreparable harm and continuing damages to the Company and its business and that the Company's remedy at law for any such breach or anticipated or threatened breach will be inadequate. Accordingly, in addition to any and all other remedies that may be available to the Company at law or in equity in such event, any court of competent jurisdiction may issue a decree of specific performance or issue a temporary and permanent injunction, without the necessity of the Company posting bond or furnishing other security and without proving special damages or irreparable injury, enjoining and restricting the breach or threatened breach oy any such covenant, including, but not limited to, any injunction restraining Employee from using or disclosing, in whole or part, any Confidential Information. Ex. 1 at ¶10(b).

46.     Nothing in the Agreement prohibits Kedir from working in her chosen field, or even for a direct competitor of Hightower, such as Steward. She is merely required to not misuse Hightower's information or poach Hightower business.

47.     Kedir's commitment to maintain the confidentiality of Hightower's client information is also set forth in other Hightower policies and agreements.

## COUNT I – BREACH OF CONTRACT

48.     Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

49.     Plaintiffs have performed all of their material obligations under the Agreement, a valid and enforceable contract.

50.     Kedir breached the Agreement by, among other things, removing and using Hightower confidential information, disparaging Hightower, and by contacting, soliciting, and transferring Hightower clients to her new employer.

51.     Kedir's breaches of the Agreement have damaged Hightower in the form of lost revenue and business, loss of customer goodwill, and loss of confidentiality of client records and proprietary strategies, among other things.

<u>**COUNT II – MISAPPROPRIATION OF TRADE SECRETS**</u>
**(IN VIOLATION OF THE DEFEND TRADE SECRETS ACT – 18 U.S.C. § 1836 *et seq.*)**

52.     Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

53.     Kedir had full access to Hightower's client lists, client contact and financial information, proprietary investment strategies, and other confidential and/or proprietary information, all of which constitute trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.  Because Hightower services client accounts in several states, and invests its clients' money in products in interstate commerce, these trade secrets are related to products and services used in and intended for use in interstate commerce.

54.     Under the DTSA, trade secrets include all forms and types of financial information, business, technical, and economic information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorized physically, electronically, graphically, photographically, or in writing.  18 U.S.C. § 1839(3). Hightower's client lists, client contact and financial information, proprietary investment strategies, and other confidential and/or proprietary information fall squarely within the DTSA's definition of a trade secret.

55.     Hightower's trade secrets and confidential and/or proprietary information derive independent economic value, actual and potential, from not being generally known to and/or readily ascertainable through proper means by other persons who could obtain economic value from the disclosure or use of such information.  Hightower expends significant resources to obtain and protect these trade secrets, and Hightower is entitled to rely upon its ability to protect those trade secrets from disclosure to or use by a competitor.  Furthermore, Hightower is the entity in which rightful legal or equitable title to, or license in, the trade secrets are reposed.

56.     In fact, Hightower took active steps, which were reasonable under the circumstances, to maintain the secrecy of this confidential, proprietary, and/or trade secret information.  Generally, to protect itself from unfair competition, Hightower makes substantial efforts to ensure the confidentiality of information concerning its clients and strategies.  In addition to the contractual safeguards set forth in the Agreement, Hightower implements policies and the other security measures described above.

57.     Kedir has willfully and maliciously misappropriated, disclosed, used, and continued to use these trade secrets and confidential and/or proprietary information to assist her in furthering the business interests of Steward, which is in direct competition with Hightower. Further, Kedir took such trade secrets and confidential and/or proprietary information without authorization, and without a right or privilege to do so, and by improper means, including breaches of her contractual duties and duties of loyalty and confidentiality. Kedir knew or should have known the information was confidential and protected as a trade secret, and acquired by improper means; but, instead, received and used the information intentionally or with reckless disregard. Hightower has demanded the return of those pieces of trade secret information it knows to be in Kedir's possession, and she has refused to comply.

58.     Upon information and belief, Kedir has disclosed and/or used Hightower's trade secrets without express or implied consent. She used improper means to acquire Hightower's trade secrets, including breach and inducement of breach of duties to maintain secrecy of the trade secrets. Furthermore, at the time of disclosure and/or use of Hightower's trade secrets, Kedir knew or had reason to know that the trade secrets were (i) derived from or through persons who had used improper means to acquire the trade secrets; (ii) acquired under circumstances giving rise to a duty to maintain the secrecy or limit the use of the trade secrets; and (iii) derived from or through persons who owed duties to Hightower to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

59.     Thus, Kedir has converted and wrongfully appropriated for her own use Hightower's trade secrets and confidential and/or proprietary information, in violation of the Defend Trade Secrets Act. *See* 18 U.S.C. § 1836 *et seq*.

60.     Kedir's misappropriation and use of Hightower's trade secrets and confidential and/or proprietary information as described herein was intentional, willful and/or carried out with malice and an intent to injure Hightower and its businesses, and has directly and proximately caused, and will continue to cause, Hightower to suffer damages and other irreparable harm.

## <u>COUNT III – UNFAIR COMPETITION</u>

61.     Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

62.     Kedir has been and is continuing to engage in unfair competition with Plaintiffs, through misappropriation of trade secrets, misappropriation of confidential customer information, misappropriation of confidential investment strategies, breach of common law and contractual

duties, and by disparaging Hightower and its business practices. In doing so, Kedir has jeopardized Hightower's business by unfair methods.

63. As a result of these unfair methods, Hightower has suffered, continues to suffer, and will suffer damages and irreparable harm.

## COUNT IV – BREACH OF DUTY OF LOYALTY

64. Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

65. In both Illinois and Florida, employees are bound to carry out their duties in good faith and not to act to the detriment of their employer. This duty is breached when the employee improperly competes with his or her current employer while still employed. Kedir breached this duty by removing and misusing confidential information, and by soliciting clients and prospective business away from Hightower while still a Hightower employee.

66. As a result of Kedir's actions, Hightower has suffered, continues to suffer, and will suffer damages and irreparable harm.

## COUNT V – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND PROSPECTIVE ECONOMIC ADVANTAGE

67. Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

68. Hightower maintains business relationships with its clients, prospective clients, sources of referral business, and other third parties. Hightower has a reasonable expectation of continuing these valid business relationships with third parties and entering into new valid business relationships. Kedir has knowledge of these relationships; in fact, she was tasked with developing and maintaining many of these relationships. When she removed confidential information, breached contractual and common law duties, and disparaged Hightower, Kedir was acting

intentionally and without justification to interfere with Hightower's expectations and relationships. Kedir's interference prevented Hightower's legitimate business expectancies from continuing and/or ripening into valid business relationships.

69.     As a result of Kedir's actions, Hightower has suffered, continues to suffer, and will suffer damages and irreparable harm.

## COUNT VI – CONVERSION

70.     Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

71.     Kedir has removed and is using Hightower's trade secrets and confidential information.  Hightower has ownership rights and the right to possess these trade secrets and confidential information.  Kedir converted the same by wrongful acts, including breaches of common law, contractual, regulatory, and statutory obligations.

72.     As a result of the conversion of this confidential, proprietary, and trade secret information, Hightower has suffered, continues to suffer, and will suffer damages and irreparable harm.

## COUNT VII – VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT

73.     Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

74.     Kedir's conduct in removing Hightower trade secrets and client information, in using that information to solicit Hightower clients (both before and after her resignation), and disclosing that information to third parties and a competitor, Steward, constitutes unauthorized computer access under federal law.

75.     The Computer Fraud and Abuse Act, 18 U.S.C. § 1030 is the controlling statute for deciding issues of unauthorized computer access under federal law. The CFAA allows for injunctive relief and other remedies in a civil action brought under this act.

76.     A person violates the CFAA when he or she "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains – (A) information contained in a financial record of a financial institution [...] or (C) information from any protected computer."  18 U.S.C. § 1030(a)(2)(A), (C).  The act defines "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled to so obtain or alter."  The act defines a "financial record" as "information derived from any record held by a financial institution pertaining to a customer's relationship with the financial institution." and defines a "financial institution" to include "a broker-dealer registered with the Securities and Exchange Commission pursuant to section 15 of the Securities Exchange Act of 1934." 18 U.S.C. § 1030(e)(4-5).  The act further defines a "protected computer" as a computer "exclusively for the use of a financial institution [...] or, in the case of a computer not exclusively for such use, used by or for a financial institution [...] and the conduct constituting the offense affects that use by or for the financial institution [...]; or (B) which is used in or affecting interstate commerce." 18 U.S.C. § 1030(e)(2)(A-B).

77.     Any person who suffers damage or loss due to a violation of the CFAA may pursue injunctive and other equitable relief through civil action against the violator, so long as the losses during any 1-year period aggregate to at least $5,000. 18 U.S.C. § 1030(g).

78.     Kedir exceeded authorized access to Hightower's computer systems when she accessed and removed Hightower's confidential client information, client financial records, and proprietary investment strategies to solicit Hightower accounts to Steward.  She was not authorized

to access or remove this information for these purposes. The computer(s) that Kedir used both were exclusively for use in conducting Hightower business and were used in or affecting interstate commerce.

79.     Hightower qualifies as a financial institution as it is defined in the CFAA. Furthermore, Hightower has already sustained well above $5,000 in losses as the result of Kedir's unauthorized access, taking into account lost investment management fees, the costs to investigate her actions, and the legal fees expended in bringing this claim, among other costs. Therefore, Hightower is entitled to damages and injunctive relief against Kedir under the CFAA to prevent further immediate and irreparable harm as a result of her unauthorized access.

## COUNT VIII – UNJUST ENRICHMENT

80.     Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

81.     Hightower conferred benefits on Kedir in the form of client relationships, confidential information, financial and other support, and licensing. Kedir was aware of these benefits, and retained benefits from confidential information and client relationships under circumstances where it would be unjust to retain the same without payment. To wit, Kedir continues to use Hightower's information and leverage Hightower relationships following her resignation from Hightower to remove Hightower's business.

## COUNT IX – DEFAMATION

82.     Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

83.     Kedir has published false and defamatory statements concerning Hightower, including those described above. In a widely circulated press release, Kedir stated that she "will

have the opportunity to offer fiduciary advice" to her clients now that she has left Hightower. Kedir also stated that Steward—compared to Hightower—was focused on the future, will provide her the ability to market her own firm, and will allow her to maximize her growth potential.

84.     These statements, published to third parties, are unprivileged.

85.     Kedir was at least negligent in publishing these statements.  She knew or should have known that these statements were false.  To wit, she knows that Hightower and Steward are bound by the same fiduciary duties when providing advice to clients.  Kedir also knows that Hightower is focused on the future, and provided her with opportunities to market and maximize her growth potential—including through sponsoring her as she sought the CFP designation and handing her a significant number of client accounts.

86.     These statements have damaged Hightower's reputation, impaired its ability to conduct business, contributed to the loss of client accounts, and otherwise harmed Hightower.

## COUNT X – FOR INJUNCTIVE RELIEF

87.     Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

88.     Hightower is moving for a preliminary injunction to maintain the status quo and prevent irreparable harm which is being caused by Kedir's conduct.

89.     Kedir's wrongful conduct in removing and using Hightower's confidential client information and confidential investment strategies, soliciting clients, and moving business away from Hightower to Steward has caused and will continue to cause great and irreparable injury to Hightower unless and until Kedir's conduct is immediately enjoined.  As described above, in the days since Kedir resigned from Hightower, Hightower has lost more than $50 million in assets under management.

90.     If Kedir's improper conduct continues, Hightower will continue to lose clients, business relationships, and the competitive advantage of its proprietary investment strategies that required substantial efforts to develop and protect. Moreover, the confidentiality of Hightower's customer information and trade secrets are being destroyed. Kedir's ongoing actions threaten the more than $100 million remaining in assets under management she serviced while employed by Hightower, in addition to untold numbers of prospective clients, referral sources, and other business relationships. Moreover, her actions also threaten to damage office continuity, confidentiality of client information (which could have regulatory implications), and goodwill, among other things.

91.     Hightower has no adequate remedy at law for the injuries it is currently suffering as a result of Kedir's wrongful conduct because the full extent and scope of Hightower's losses are unquantifiable or unascertainable.

92.     Hightower is likely to succeed on the merits of its claims because it has evidence that Kedir removed Hightower's confidential and trade secret information, and that several of its clients terminated their relationships with Hightower as a result of being wrongfully contacted and solicited by Kedir. Evidence of wrongdoing will grow once Hightower receives discovery from Kedir, which it is asking for on an expedited basis by way of a Motion for Expedited Discovery, that will be filed shortly following this Complaint. Upon receipt of Kedir's responses to these discovery requests, Hightower will move for a preliminary injunction seeking the following: (1) an order prohibiting Kedir from retaining, using, or disclosing Hightower's confidential information; (2) an order prohibiting Kedir from soliciting or otherwise improperly contacting Hightower's clients; and (3) an order requiring that Kedir return all of Hightower's confidential information, as defined and required in the Agreement.

93. The balance of hardships strongly favors granting a preliminary injunction here, as Hightower will continue to suffer irreparable harm if such relief is not granted and Kedir will suffer no hardship if such relief is granted. Kedir will not be prejudiced in her current employment position whatsoever.

94. The Agreement prohibits Kedir from using and/or maintaining Hightower's confidential information, and from soliciting or contacting Hightower's clients for a specific period of time. Therefore, enjoining Kedir's conduct will simply put her in the position she agreed to be in, both when she joined Hightower and when she separated from Hightower. On the other hand, Hightower will continue to suffer irreparable harm if Kedir's unlawful conduct is not enjoined.

## ATTORNEYS' FEES

95. Hightower is entitled to recover attorneys' fees and costs pursuant to the Agreement. Paragraph 10(b) of the Agreement states: "Employee further agrees to pay all of the Company's costs and expenses, including reasonable attorneys' and accountants' fees and expenses, incurred in enforcing such covenants [referenced above]." *See* Ex. 1, at ¶10(b).

## V. JURY DEMAND

96. Hightower hereby demands a jury trial in this matter.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

A. Award Hightower actual damages for the foregoing wrongful acts by Kedir, in an amount to be proven at trial, of not less than ONE MILLION DOLLARS ($1,000,000.00);

B. Award Hightower exemplary and punitive damages for the foregoing willful, malicious, and intentional wrongful acts by Kedir, in an amount consistent with 18 U.S.C. § 1836(b)(3)(C);

C. Enter a preliminary and permanent injunction providing that:

1) For a period of twelve (12) months, Kedir shall not, directly or indirectly, on her own behalf or on behalf of any other person:

> (a) contact, request, solicit, or encourage, or direct any Person to contact, request, solicit or encourage any of Hightower's customers or prospective customers serviced by Kedir or whose name became known to Kedir by virtue of her employment with Hightower for the purpose of:
>
>> (i) providing any products, services, or advice that are the same as or similar to any of the products, services and/or advice provided by Hightower, and/or
>>
>> (ii) entering into any agreement, engagement, or opportunity to provide any such products, services and/or advice to Hightower's customers or prospective customers;
>
> (b) otherwise interfere with, reduce, or harm Hightower's relationships with its clients, prospective clients, or business contacts;
>
> (c) accept or receive any transfer of assets, accounts or confidential or personal information related to any Hightower customer or prospective customer;

2) Kedir shall not disclose or otherwise use Hightower's confidential information in any manner or medium whatsoever; and

3) Kedir shall return all Hightower confidential information.

D. Award Hightower its costs, including reasonable and necessary attorneys' fees, as well as expert fees;

E. Award Hightower prejudgment and post-judgment interest as allowed by law; and

F. Award Hightower such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

Dated this 2nd day of November, 2023.

Respectfully submitted,

**HENNEMAN RAU KIRKLIN & SMITH LLP**

By: _/s/ Matthew B. Henneman_
Matthew B. Henneman
Texas State Bar No. 00790865

27

Federal ID No. 21661
815 Walker Street, Suite 1440
Houston, Texas 77002
Phone: 713-955-6030
Fax: 713-955-6141
Email: mhenneman@hrkslaw.com

**ATTORNEYS FOR PLAINTIFFS,
HIGHTOWER HOLDING, LLC AND
HIGHTOWER ADVISORS, LLC**