UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HIGHTOWER HOLDING, LLC, and
HIGHTOWER ADVISORS, LLC,

               Plaintiffs,

      v.

FAIZA KEDIR,

               Defendant.

No. 23 CV 15616

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Defendant Faiza Kedir worked as a business director and financial advisor for LBPWM, an affiliate of plaintiffs Hightower Holding and Hightower Advisors, for nearly two years. Upon her resignation from LBPWM, she emailed several documents to her personal account and soon began working at a competitor financial firm. Several of Kedir's clients followed her to the competitor. Hightower brings this case alleging that Kedir violated the restrictive covenant in her employment agreement, misappropriated trade secrets, and defamed Hightower, among other claims. Hightower seeks injunctive relief prohibiting Kedir from soliciting Hightower's clients and to return or destroy the emailed documents. Kedir moves to dismiss Hightower's defamation claim and argues that injunctive relief is inappropriate because the restrictive covenant is unenforceable and Hightower faces no irreparable harm.

## I. Facts

Plaintiffs Hightower Holding, LLC and Hightower Advisors, LLC, are an investment advisory and wealth management firm that provides investment, financial, and retirement planning services.[1] [1] ¶ 11. LBPWM is a Hightower affiliate. [1] ¶ 34.

Defendant Faiza Kedir began working with Hightower's LBPWM team in November 2021, as a director of business development and then a financial advisor. [1] ¶ 18. Before working at Hightower, Kedir did not have experience developing investing or financial planning strategies on her own. [1] ¶ 19.

At the start of her employment, Kedir signed a Standard Protective Agreement, which set the terms of her employment and detailed post-employment restrictive covenants. [1] ¶ 42. The agreement's confidentiality provision required:

> At all times during and after Employee's employment with the Company, Employee shall (i) hold the Confidential Information in the strictest confidence and take all reasonable precautions, including following all Company policies and directives, to prevent the inadvertent disclosure of Confidential Information to any unauthorized individual or entity; and (ii) not disclose or otherwise use the Confidential Information in any manner or medium whatsoever, except as required to perform Employee's duties for the Company or with the Company's prior written consent.

[1-1] ¶ 3(c). "Confidential Information" was defined as:

> [I]nformation or documents relating to: (i) financial matters, regulatory matters, business, planning, operations, products or services, potential products or services, technical information and/or know-how,

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. When a document has numbered paragraphs, I cite to the paragraph, for example [1] ¶ 1. The facts are taken from Hightower's complaint, [1], as well as exhibits and affidavits attached to the parties' preliminary injunction briefs, [45], [48].

organization charts, formulas, proposals, outlines, business plans, production, purchasing, marketing, pricing, sales, profit, personnel, customers, prospective customers, employees, prospective employees, recruiting, suppliers, and any other competitively sensitive or proprietary information; (ii) trade secrets; (iii) papers, data, records, processes, methods, techniques, systems, models, samples, devices, equipment, programs, compilations, invoices, lists or documents; (iv) confidential information or trade secrets of any third party; (v) the identity of the Company's financial advisors (and candidates for prospective recruitment), Customers, Prospective Customers, vendors and business partners, (vi) revenue and cost figures, economic models and projections, procedures, broker and financial advisor recruitment candidates, lists and information, retention and compensation models and plans, pricing information, business development lists, customer lists, customer prospect lists and requirements and methods of customer development, and (vii) any other information, written, oral, or electronic, whether existing now or at some time in the future, whether pertaining to current or future developments, and whether previously accessed during Employee's tenure with the Company or to be accessed during the Employee's future employment with the Company, which pertains to the Company's affairs or interests or with whom or how the Company does business.

[1-1] ¶ 3(a). "Confidential Information" excluded:

(a) information properly in the public domain (and through no breach of this Agreement or any other agreements that the Company may have entered into with Employee or other Persons), or (b) information that was lawfully in Employee's possession and evidenced in writing prior to the date of Employee's employment with the Company, except to the extent that such information is or has become a trade secret of the Company or is or otherwise has become the property of the Company.

*Id.*

The agreement also provided that, during her employment and for a period of twelve months after employment, Kedir could not, directly or indirectly:

(a) contact, request, solicit or encourage, or direct any Person to contact, request, solicit or encourage any of the Company's brokers, financial advisors, employees, independent contractors, recruits, Customers or Prospective Customers (the "Protected Business Contacts"), for the purpose of (i) providing said [customers] any products, services and/or advice that are the same as or similar to any of the products, services

3

and/or advice provided by the Company and/or (ii) entering into any agreement, engagement, or opportunity to provide any such products, services and/or advice to said Protected Business Contacts; or […] (c) otherwise interfere with, reduce, or harm the Company's relationships with such Protected Business Contacts [...].”

[1-1] ¶ 4. “Protected Business Contacts” include the Company's brokers, financial advisors, employees, independent contractors, recruits, customers, and prospective customers. [1-1] ¶ 5. “Company” encompasses Hightower Holding, LLC, Hightower Advisors, LLC, and their subsidiaries, parents, affiliates, successors, and assigns. [1-1] at 1.

The agreement also restricted Kedir, for twelve months after her termination, from accepting or receiving any transfer of assets, accounts, confidential or personal information related to any Protected Business Contact. [1-1] ¶ 5. Kedir also agreed to not make any disparaging, untrue, or misleading written or oral statements about the company, or its services and products, during her employment or at any time after termination. [1-1] ¶ 7. The agreement provided that injunctive relief would be appropriate to prevent irreparable harm that would be caused by breaches of the restrictive covenant. [1-1] ¶ 10(b).

Kedir resigned from Hightower in September 2023. [1] ¶ 21. After her resignation, Hightower found that Kedir emailed client account numbers, detailed holding information, financial information, a list of alternative investments and mutual funds held by Hightower in its models, and portfolio strategy simulations for four of Hightower's most implemented strategies, to a personal email account. [1] ¶¶ 22–25. Kedir was not involved in developing these strategies and did not have the

4

training or experience to create comparable investment strategies independently. [1] ¶ 24.

According to Hightower, these documents contained confidential information and trade secrets, including the allocation strategies that made up Hightower's "secret sauce." [1] ¶ 22. Hightower alleges it has demanded the return of this information, but Kedir refused. [1] ¶ 28. According to Kedir, she offered to return or destroy the documents, to the extent she still possessed them, on at least two occasions, but Hightower never responded. [48] at 19 (citing [48-2] at 2–3).

Since resigning, Kedir began working at Hightower's competitor, Steward. [1] ¶ 27. At the time of her resignation, Kedir was the lead advisor to or had a substantial relationship with client accounts totaling more than $150 million in assets under management. [1] ¶ 40. Kedir solicited these clients to move from Hightower to Steward and has moved more than $50 million in assets representing approximately $450,000 in annual revenue. [1] ¶¶ 28–29, 40. Kedir has also contacted at least one former Hightower portfolio manager to recruit him to join her at Steward. [1] ¶ 31.

Kedir communicated false and misleading information to Hightower clients about its business. [1] ¶¶ 33–39.[2] Kedir informed Hightower clients that LBPWM had been sold and was no longer run by two of its partners, Michael Landsberg and Lew Bennett. [1] ¶¶ 33, 35–37, 39. These clients expressed confusion about the status of LBPWM and their accounts. [1] ¶ 39.

---

[2] When reviewing a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a court accepts all well-pled allegations as true and draws all reasonable inferences in favor of the plaintiff. *Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 881 (7th Cir. 2022).

5

Kedir also published misleading and untrue statements regarding her own credentials and Hightower's business practices. [1] ¶ 32. Kedir's public LinkedIn profile stated that she was a Certified Financial Planner for more than eleven years. *Id.* In a Steward press release, Kedir stated that she had been searching for outside employment "for the last few years," and noted that she "will have the opportunity to offer fiduciary advice" to her Steward clients. *Id.* She also stated Steward is "focused on the future," would provide her "the ability to market" her own firm with Steward support and resources, and would allow her "to maximize the growth potential" of her business. *Id.*

Hightower sues Kedir for breach of contract, misappropriation of trade secrets, unfair competition, breach of duty of loyalty, tortious interference with business relationships and prospective economic advantage, conversion, violations of the Computer Fraud and Abuse Act, unjust enrichment, and defamation. [1] ¶¶ 48–86. It also seeks a preliminary injunction to prohibit Kedir from using Hightower's confidential data and strategies, soliciting clients from Hightower to Steward, and accepting any transfer of assets, accounts or information related to any Hightower customer or prospective customer. [1] ¶¶ 87–94; [45].

Kedir moves to dismiss Hightower's claims for defamation, [21], and contests Hightower's request for a preliminary injunction, [48].

## II.    Motion to Dismiss Defamation Claim

"To survive a motion to dismiss, a plaintiff must plead 'only enough facts to state a claim to relief that is plausible on its face.'" *Gociman*, 41 F.4th at 881 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

6

To state a defamation claim, a plaintiff must plead "that (1) the defendant made a false statement about the plaintiff, (2) the defendant made an unprivileged publication of that statement to a third party, and (3) the publication caused damages." *project44, Inc. v. FourKites, Inc.*, 2024 IL 129227, ¶ 20.[3] A defamatory statement harms a business's reputation to the extent that it lowers the company in the eyes of the community or deters the community from associating with it. *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009). "A statement is defamatory per se if the harm is obvious and apparent on its face." *Id.* Illinois recognizes five categories of statements that are defamatory per se, two of which are potentially applicable here—words that impute a company is unable to perform or lacks integrity in performing its business duties and words that impute a company lacks ability or otherwise prejudices that company in its field. *Id.* at 491–92.

Hightower argues that Kedir's statements about her qualifications and in the Steward press release are defamatory per se because, despite never mentioning Hightower, they falsely imply that Hightower is not focused on the future and that Kedir was unable to offer fiduciary advice or to maximize her growth potential while at Hightower. [25] at 5. According to Hightower, these statements impugn the business's competence and integrity and prejudice Hightower in its business. *Id.* Kedir argues that these statements only discuss what opportunities she will have in the future, independent of her past at Hightower. [21] at 3–4. Thus, they are not so

---

[3] The parties agree that Illinois law governs Hightower's common law claims. *See* [21] at 3; [25] at 4.

7

obviously and materially harmful to Hightower that injury to its reputation may be presumed. *Id.*

I agree with Kedir. Under the innocent-construction rule, "a statement that is defamatory per se will not be actionable if it is reasonably capable of an innocent construction." *Huon v. Denton*, 841 F.3d 733, 738 (7th Cir. 2016). Hightower asks that I ignore the innocent explanation that Kedir was genuinely excited about her new position, arguing this would go beyond the four corners of the complaint. [25] at 6. But "a court must give the defendant's words their natural and obvious meaning, after having considered both the substance of defendant's alleged statements and the context in which they allegedly were made." *Huon*, 841 F.3d at 738. Even without the innocent construction rule, someone reading Kedir's statements would not infer a direct reference to Hightower based on her previous affiliation. Kedir's statements are simply about her own experience and her future at Steward, with no plausible reference or comparison to her prior employment at Hightower. Nor does Hightower state a claim for defamation per quod, which requires a plaintiff plead special damages. *See Green*, 234 Ill.2d at 495.

As for the alleged statements regarding LBPWM's change in ownership and management, Hightower has adequately alleged that these statements were false, that Kedir's statements were not privileged, and that her statements caused Hightower damages. According to Hightower, Kedir informed Hightower clients that LBPWM had been sold and was no longer run it by two of its partners, Landsberg and Bennett. [1] ¶¶ 33–37. Hightower alleges that these statements were false, and

Kedir knew they were false. [1] ¶ 38. Kedir makes no argument that these statements were privileged. *See* [21] at 3–5 (only addressing the Steward press release); [30] at 4–5 (same). Hightower also alleges that the statements were damaging as they caused clients to be confused about LBPWM and their accounts, damaging Hightower's client relationships. [1] ¶ 39.

Kedir's motion to dismiss Hightower's defamation claim is granted as to Kedir's statements regarding her qualifications and future at Steward. It is denied as to Kedir's statements regarding LBPWM being sold and its management leaving.

## III.    Preliminary Injunction

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20; *see also Starbucks Corp. v. McKinney*, 144 S.Ct. 1570, 1576 (2024).

### A.    Likelihood of Success on the Merits

Hightower's request for injunctive relief centers around its claims that Kedir violated the restrictive covenant in her employment agreement and that Kedir misappropriated Hightower's trade secrets. Hightower has presented evidence that Kedir solicited at least $50 million assets under management, representing close to $450,000 in annual revenue. [38] at 115:5–18. Kedir does not dispute this evidence; rather, she argues that the restrictive covenant is unenforceable. [21] at 6–9; [48] at 20–28.

9

Hightower also presents evidence that Kedir sent allegedly confidential information and trade secrets to herself before resigning, including customer data, contact information, and proprietary investment strategies. [1-5]; [1-6]; [1-7]. Kedir contests that this information constitutes trade secrets. [48] at 14–17.

### 1. Restrictive Covenant

#### a. Adequate Compensation

Under Illinois law, before determining the reasonableness of a restrictive covenant, a court must determine whether the covenant is ancillary to a valid contract and whether the covenant is supported by adequate consideration. *Fifield v. Premier Dealer Servs., Inc.*, 2013 IL App (1st) 120327, ¶ 13. "Illinois courts analyze the adequacy of consideration in the context of postemployment restrictive covenants because . . . a promise of continued employment may be an illusory benefit when the employment is at-will." *Id.* ¶ 14. Continued employment alone can be adequate consideration but only if such employment continues for "a substantial period of time." *Brown & Brown, Inc. v. Mudron*, 379 Ill.App.3d 724, 728 (3d Dist. 2008)

Kedir argues that Illinois uses a bright-line rule that continued employment for less than two years is insufficient consideration for a restrictive covenant in an employment contract. [21] at 6. If correct, Kedir, who was employed for twenty-two months after she signed the contract, did not receive adequate consideration for the covenant. *See* [1] ¶¶ 18, 21; [1-1] at 11.

The Illinois Supreme Court has not defined what satisfies "a substantial period of time." But it would likely reject a bright-line, two-year rule, and would instead consider whether there was evidence of additional benefits, beyond continued

10

employment, that constituted adequate consideration for the restrictive covenant. *See Bankers Life & Cas. Co. v. Miller*, No. 14 CV 3165, 2015 WL 515965, at *3–4 (N.D. Ill. Feb. 6, 2015) (citing *Reliable Fire Equip. Co. v. Arredondo*, 2011 IL 111871, ¶ 16); *see also Midwest Lending Corp. v. Horton*, 2023 IL App (3d) 220132, ¶¶ 12–19; *McInnis v. OAG Motorcycle Ventures, Inc.*, 2015 IL App (1st) 142644, ¶¶ 30–36.

While the length of time that Kedir was employed should be part of the analysis of whether consideration was adequate, the totality of the circumstances determines if consideration was adequate. Kedir resigned from her position twenty-two months after signing her employment agreement. [1] ¶¶ 18, 21; [1-1] at 11. The agreement provided other consideration, including access to Hightower confidential information, special knowledge of Hightower's customer and prospect relationships, $349,000, participation in conference and marketing programs, and Hightower's facilitation of Kedir's required industry licensing, in exchange for Kedir's agreement to the restrictive covenant. [45] at 17 (citing [38] at 94:1–95:2, 95:12–96:5).

This evidence of additional consideration combined with 22 months of continued employment could constitute adequate consideration for a postemployment restrictive covenant. *See, e.g., W. Capra Consulting Grp., Inc. v. Snyder,* No. 19 C 4188, 2019 WL 3935045, at *8 (N.D. Ill. Aug. 20, 2019) (finding 18 months of continued employment adequate due to presence of other consideration in exchange for the restrictive covenant and listing cases with similar holdings).

b.     Enforceability of Non-Solicitation Clause

Illinois uses a reasonableness test to determine the enforceability of a restrictive covenant. *Reliable Fire*, 2011 IL 111871, ¶ 17. A restraint on trade is

reasonable only if it: (1) is no greater than is required to protect a legitimate business interest of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public. *Id.* Further, the activity, time, and geographic restrictions must be reasonable. *Id.*

The agreement prohibits solicitation of any "Protected Business Contact" which is broadly defined to include the Company's brokers, financial advisors, employees, independent contractors, recruits, customers, or prospective customers. [1-1] ¶ 4(a). Company is defined as Hightower Holding, LLC, Hightower Advisors, LLC, and their subsidiaries, parents, affiliates, successors, or assigns. [1-1] at 1.

Whether a legitimate business interest exists in these contacts is based on the totality of the circumstances, and a court considers the following non-exhaustive factors: the employee's acquisition of confidential information through their employment, the near permanence of customer relationships, and time and place restrictions. *Reliable Fire*, 2011 IL 111871, ¶ 43. "No factor carries any more weight than any other, but rather its importance will depend on the specific facts and circumstances of the individual case." *Id.*

In determining near permanence of customers, Illinois courts generally focus on the resources invested in procuring and retaining customers, the length of a customer relationship, whether a business engendered customer loyalty by providing a unique product or personal service, and the exclusivity of the customer and business, among other factors. *Dent Wizard Int'l Corp. v. Andrzejewski*, 2021 IL App (2d) 200574-U, ¶ 24 (unreleased for publication in permanent law reports and subject

12

to change until published) (quoting *Audio Properties, Inc. v. Kovach*, 275 Ill.App.3d 145, 148–49 (1995)) (citing *Lawrence & Allen, Inc. v. Cambridge Hum. Res. Grp., Inc.*, 292 Ill.App.3d 131, 142 (1997)).

Hightower argues that its customers are "near-permanent" because it "spends substantial resources in terms of time, effort and money to build relationships with its clients and assist its advisors in developing business." [45] at 19–20. According to Hightower, it has built the loyalty of its client base through this effort and has invested substantially in building Hightower's goodwill. [45] at 20. But Hightower presents limited evidence of this—only that it paid for client events. *Id.* (citing [40] at 223:6–12).

Kedir argues that Hightower has no legitimate business interest in the clients who have transferred their accounts to Steward because Kedir introduced them to Hightower. [48] at 26. According to Kedir, Hightower invested very few resources in procuring and maintaining these clients. [48] at 27–28. Of the thirty-two clients who transferred their accounts to Steward, the parties agree that Kedir introduced at least twenty-six to Hightower. [38] at 18:25–35:6; [40] at 260:18–290:19. Kedir argues that a firm does not have a legitimate proprietary interest in clients who were introduced by the employee. [48] at 26 (citing *Am. Hardware Mut. Ins. Co. v. Moran*, 545 F.Supp. 192, 196 (N.D. Ill. 1982)). If Hightower's legitimate business interest relies on the premise that Kedir would not have known of these clients but for her employment, then Kedir's evidence that she knew the clients before they knew Hightower weakens Hightower's claim.

That said, whether a client relationship is near-permanent "turns in large degree on the nature of the business involved." *Office Mates 5, N. Shore, Inc. v. Hazen*, 234 Ill.App.3d 557, 571 (1st Dist. 1992). Illinois courts often distinguish "between sellers of services, especially professional services such as accounting and consulting, and sellers of ordinary goods." *Curtis 1000 v. Suess*, 24 F.3d 941, 948 (7th Cir. 1994). "In the former class, where the quality of the seller's service is difficult to determine by simple inspection, customers come to repose trust in a particular seller, and that trust is a valuable business asset, created by years of careful management[.]" *Id.* This class of businesses also includes sellers of specialized products or services that are based on a business's acquired knowledge of its individual customers' needs. *See, e.g., Scheffel Fin. Servs., Inc. v. Heil*, 2014 IL App (5th) 130600, ¶ 2 (upholding finding that independent wealth management service had near-permanent relationship with investors); *A.B. Dick Co. v. American Pro-Tech*, 159 Ill.App.3d 786, 793 (4th Dist. 1987) (finding near-permanent relationship for business that provided repair and maintenance services for various copiers, microfiche, and offset printing equipment). The financial investment market fosters customer loyalty due to the long-term nature of investments and the need for trust and individualization in financial services. The nature of financial services engenders near-permanent client relationships.

Time and place restrictions also factor into determining whether a restrictive covenant reasonably protects legitimate business interests. *Reliable Fire*, 2011 IL 111871, ¶ 43. The non-solicitation clause in Kedir's contract lasts only for one year, [1-1] ¶ 4, which Illinois courts have found to be reasonable. *See Mohanty v. St. John*

*Heart Clinic, S.C.*, 225 Ill.2d 52, 77–78 (2006) (upholding three- and five-year restrictive employment covenants); *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys., LLC*, No. 02 C 5403, 2003 WL 1057929, at *20 (N.D. Ill. Mar. 10, 2003), *aff'd*, 428 F.3d 706 (7th Cir. 2005) (listing Illinois Supreme Court cases upholding non-compete agreements lasting for one year or more).

But a non-solicitation clause must be "reasonably related to the employer's interest in protecting customer relations its employees developed while working for the employer." *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill.App.3d 437, 455 (1st Dist. 2007). "Courts are reluctant to enforce provisions that prohibit former employees from servicing customers they never had contact with while working for their original employer." *Id.* "[W]here an activity restraint, such as a covenant not to solicit, lacks *both* a geographic limitation and any qualifying language concerning the particular customers to which it applies, it is unreasonable." *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 308 Ill.App.3d 337, 345 (1st Dist. 1999).

The scope of this non-solicitation agreement is greater than necessary to protect Hightower's legitimate business interest. While the clause is limited to twelve months, it limits Kedir from soliciting any "Protected Business Contact." [1-1] ¶ 4. Protected Business Contacts include all individuals and entities that have any relationship—be it as a prospective customer, broker, financial advisor, independent contractor, or recruit—with the two Hightower plaintiffs, their "subsidiaries, parents, affiliates, successors or assigns." [1-1] at 1, ¶ 4. This is regardless of whether Kedir

15

had a relationship with the individual or entity while she worked at LBPWM. Such a broad definition makes it nearly impossible to identify who is a Protected Business Contact.[4] Given that the covered business contacts are nearly unknowable, the non-solicitation requirement set forth in the agreement is likely unreasonable. *See, e.g.*, *AssuredPartners, Inc. v. Schmitt*, 2015 Il App (1st) 141863, ¶¶ 40–41 (finding nonsolicitation provision unenforceable because the protected customers included any potential "customer, supplier, licensee or other business relation" with whom any of the plaintiff entities and their subsidiaries had interacted); *Cambridge Eng'g*, 378 Ill.App.3d at 455 (holding nonsolicitation covenant that covered "any customer, employee or representative of employer" unenforceable because it was "far broader than necessary to protect [the employer's] interest").

The agreement also restricts Kedir's business activities. The non-acceptance clause prohibits Kedir from accepting any assets, accounts, or personal information from any Protected Business Contact. [1-1] ¶ 5. Any activity restraints "must be reasonably related to the employer's interest in protecting customer relations that its employees developed as a direct result of the employment." *Eichmann*, 308 Ill.App.3d at 345. As discussed above, "Protected Business Contact" is defined to include individuals that Kedir had no contact with and may not even be able to identify.

---

[4] Hightower cites to another case in this district involving a substantially similar non-solicitation clause. [25] at 10. Judge Chang stated, "there is no apparent fatal flaw in the scope of the clause (especially as to actual Hightower customers)." But Judge Chang was not analyzing the enforceability of the restrictive covenant, just determining whether Hightower's motion for expedited discovery was appropriate. *Hightower Holding, LLC v. Rubis*, No. 21-cv-05646 (N.D. Ill. Nov. 17, 2021), [17] at 1.

Considering the breadth of Protected Business Contacts, the non-solicitation and non-acceptance clauses are likely unenforceable, and therefore Hightower is not likely to succeed on the merits of its claims seeking enforcement.

c. Enforceability of Confidentiality Provision

Confidentiality clauses, like non-solicitation clauses, are also restrictive covenants and must be reasonable, but the standard for reasonableness is more forgiving. *Coady v. Harpo, Inc.*, 308 Ill.App.3d 153, 161 (1st Dist. 1999). For example, non-compete agreements must generally include time and geographical limitations, but "a confidentiality agreement will not be deemed unenforceable for lack of durational or geographic limitations where trade secrets and confidential information are involved." *Id.* Non-compete covenants rob an employee of the ability to work, whereas confidentiality agreements only require employees to not divulge certain information. *Id.*

That does not, however, mean anything goes. For example, using information "generally available to employees, known by persons in the trade, or easily found in telephone directories and industry directories" cannot be restricted. *The Agency, Inc. v. Grove*, 362 Ill.App.3d 206, 216 (2d Dist. 2005).

The agreement provides that "at all times during and after Employee's employment with the Company," Kedir had to hold Hightower's "Confidential Information" in confidence and take measures to prevent its disclosure. [1-1] ¶ 3(c). "Confidential Information" included a broad range of "information, written, oral, or electronic," "pertain[ing] to the Company's affairs or interests or with whom or how the Company does business." [1-1] at ¶ 3(a) (see above for entire list of information

and documents included under "Confidential Information"). The agreement excluded information in the public domain and information already in the employee's possession. *Id.*

Protectible confidential information is "particularized information disclosed to [the employee] during the time the employer-employee relationship existed which [is] unknown to others in the industry and which give[s] the employer advantage over his competitors." *Lifetec, Inc. v. Edwards*, 377 Ill.App.3d 260, 270 (4th Dist. 2007) (quoting *Burt Dickens & Co. v. Bodi*, 144 Ill.App.3d 875, 879 (1st Dist.1986)).

The agreement includes much more information that what could be considered "confidential information" under Illinois law. The agreement attempts to protect nearly all information that Kedir learned during her employment, even if non-confidential. *See AssuredPartners,* 2015 IL App (1st) 141863, ¶ 45 (holding similar provision overly broad). Such information concerning "the affairs or interests" of every company affiliated with Hightower would include virtually every fact, plan, proposal, data, and opinion that Kedir became aware of during the time she was employed by Hightower—without regard as to whether such information was in any way proprietary or confidential in nature, or whether she in fact obtained the information through a source outside of her work. The agreement's confidentiality provision "does not merely restrict the dissemination of confidential information; it drastically limits [Kedir's] ability to work in [her] industry by preventing h[er] from using any knowledge that [s]he gained while in plaintiffs' employ, regardless of

18

whether [s]he gained such knowledge, directly or indirectly, as a result of h[er] employment." *See id.* ¶ 47.

The provision's exclusion of information in the public domain and an employee's prior knowledge does not lessen its overbreadth. "There is a great deal of information that is not 'generally' known to the public; not all of it merits protection under a confidentiality provision." *Id.* ¶ 48. Even with this limitation, the provision goes beyond Hightower's protectible interest and is likely unenforceable.

### d. Revising the Restrictive Covenant

Hightower argues that if I determine that the restrictive covenant is overbroad, modification of its provisions would be an appropriate remedy. [25] at 11 (citing *Arpac Corp. v. Murray*, 226 Ill.App.3d 65, 79–80 (1992)). Illinois courts may modify covenants under "some circumstances," after weighing the "key consideration" of fairness, but judicial reformation should be "looked upon with suspicion." *Cambridge Eng'g*, 378 Ill.App.3d at 456–57. "A restrictive covenant is unfair where its terms 'clearly extend far beyond those necessary to the protection of any legitimate interest' of the employer or, in other words, amount to 'unrealistic boundaries in time and space.'" *Eichmann*, 308 Ill.App.3d at 347 (quoting *House of Vision, Inc. v. Hiyane*, 37 Ill.2d 32, 39 (1967)).

The Illinois courts are hesitant to reform non-compete agreements and enforce modifications of them when the agreements are significantly overly broad. *See e.g., AssuredPartners, Inc.*, 2015 IL App (1st) 141863, ¶ 52; *Montel Aetnastak, Inc. v. Miessen*, 998 F.Supp.2d 694, 718 (N.D. Ill. 2014); *Nw. Podiatry Ctr. v. Ochwat*, 2013 IL App (1st) 120458, ¶ 47. When "drastic modifications, rather than minor ones would

be necessary," judicial modification is "tantamount to fashioning a new agreement." *Eichmann*, 308 Ill.App.3d at 348. "Modification could have the potential effect of discouraging the narrow and precise draftsmanship which should be reflected in written agreements." *Id.*

Both the non-solicitation clause and confidentiality provision go beyond the legitimate interest Hightower has in its business contacts and information. Revision would not be appropriate here, because it would require a significant modification to make the provisions comport with the law. I decline to revise the restrictive covenant at this preliminary stage of the proceedings.

### 2. *Misappropriation of trade secrets*

Owners of misappropriated trade secrets are entitled to bring a civil action under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq, if the trade secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce. Hightower alleges that it is a national financial services firm that invests in products used in interstate and international commerce. [1] ¶ 53.

To succeed on a DTSA claim, Hightower "must prove that (1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner." *Got Docs, LLC v. Kingsbridge Holdings, LLC*, 657 F.Supp.3d 1034, 1043 (N.D. Ill. 2023). Trade secrets include "all forms and types of financial, business, . . . technical, [or] economic . . . information, including patterns, plans, complications . . . prototypes, methods, techniques, processes, procedures, programs, or codes." 18 U.S.C. § 1839(3). Information qualifies as a "trade secret" if (1) "the owner thereof has taken reasonable

measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1893(3). "Whether information qualifies as a trade secret is a question of fact that requires an ad hoc evaluation of all the surrounding circumstances." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021).

"Information that is public knowledge or that is generally known in an industry cannot be a trade secret." *Id.* (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)). A company cannot publicly disclose information and then claim that the information is a trade secret. *Id.* That said, a limited disclosure does not necessary destroy all trade secret protection in information. *Id.* For example, a company does not forfeit trade secret protection by publicly displaying or selling a product unless the trade secret is "readily ascertainable" upon examination of the product. *Id.* at 541.

Hightower identifies three specific documents that it alleges contained trade secrets.[5] First, Hightower points to a chart containing Hightower investment models and descriptions of funds held in those models. [1-5]; [40] at 407. According to Landsberg, this information was proprietary and part of Hightower's "secret sauce."

---

[5] Kedir argues that Hightower has no interest in these documents because they are associated with a partner company and Lansberg testified that they were his strategies. [48] at 15 (citing [38] at 78:1–6, 52:18–21). But Hightower presents evidence that it purchased this information when it bought LBPWM. [44-5]. Hightower has demonstrated that there is a fair question as to the existence of its claimed rights. This is enough at this stage. *See Scheffel Fin. Servs., Inc. v. Heil*, 2014 IL App (5th) 130600, ¶¶ 12–14.

[38] at 140:6–141:6; [1-2] ¶ 6. He testified that the chart took almost three months to develop and required multiple meetings with various firm members to analyze and narrow a universe of alternative investments, then follow up with management and portfolio teams to ensure the funds worked for their needs. [38] at 139:20–140:13. The chart contains mutual funds and index funds used to smooth volatility in portfolios. [38] at 45:24–46:3. Hightower alleges that its proprietary information derived economic value from not being generally known. [1] ¶ 55; [1-2] ¶ 9.

Hightower presents evidence that it generally ensured the protection of its confidential and trade secret information by password protecting computer systems, encrypting the Hightower network, securing its offices during non-working hours, and hiring a monitoring security firm. [1-2] ¶¶ 7–8. Hightower's Compliance Policy and Procedures provided guidance and instructions to protect confidential information through access management, identification of potential risks to information, employee training and awareness, mobile device management, network security, asset management, and communication security. [44-2]. Hightower's Regulatory Compliance Manual required additional privacy protections and the security of electronic communication. [44-3].

Kedir argues that despite these general protections, Hightower failed to reasonably maintain the document's secrecy. [48] at 15. The document is not labeled as "confidential," and Kedir was not told its contents were proprietary or confidential. [48] at 15–16. Kedir also testified that the investment products in the email document

22

were in her own portfolio, implying she could access them that way. [40] at 122:23–123:3.

While there is some evidence that Kedir could access at least parts of this information, the countervailing evidence that Hightower repeatedly called the chart proprietary, secured its computer systems generally, and did not distribute the chart suffice to preliminarily establish that Hightower reasonably protected its contents.

Second, Hightower argues that Kedir emailed herself four primary Hightower investment portfolios implemented in the local market. [1-7]; [40] at 409–425. According to Hightower, this information was a detailed blueprint for its core investment strategies, i.e. Hightower's "secret sauce." [45] at 13; [1-2] ¶ 6; [38] at 45:16–46:3. Hightower again argues that it reasonably maintained this information's secrecy. [45] at 23–24. But LBPWM would show prospective clients these holdings and the weighting for each strategy, even providing this document to prospective clients in hard copy form. [38] at 70:3–72:12, 73:1–7. LBPWM employees were not instructed verbally or in writing to not hand out the portfolio strategies to individuals outside the office. [38] at 81:1–12. LBPWM did not tell prospective clients that this was confidential information, nor have them sign a confidentiality agreement before viewing the portfolio. [38] at 72:13–25. The document itself has no markings to indicate it contains confidential information. [1-7]; [38] at 49:20–50:3. Considering LBPWM's own sharing of the document with prospective clients without restrictions, Hightower did not make "reasonable efforts to maintain the secrecy of the information." It is unlikely to be considered a trade secret.

23

Third, Hightower points to a document with detailed holdings information for one of the Kedir's Hightower clients, including the client's name and account number. [1-6]; [40] at 448–49. Hightower asserts that using this information, a competitor could recreate its four most popular strategies "with relative ease." [1-2] ¶ 23. Kedir argues that this document was not adequately secret because Hightower clients could access the portfolio strategies in their individual investing accounts and could disclose the holdings without restriction. [48] at 16; [38] at 76:6–21. Despite Hightower's general protection of their systems, Hightower did not make "reasonable efforts to maintain the secrecy of the information" when it allowed clients to share these documents without restriction. This is particularly true as a competitor could easily reverse engineer Hightower's strategies upon examining the portfolio. *See* [1-2] ¶ 23. While a company doesn't necessarily forfeit trade secret protection by selling a product, a trade secret loses its protection if the secret is "readily ascertainable" upon examination of the product. *Life Spine,* 8 F.4th at 541. This information is unlikely to be considered a trade secret.

Out of these three documents, Hightower has only established that one could plausibly contain information "sufficiently secret to impart economic value because of its relative secrecy" and that Hightower took efforts to ensure its protection.

Hightower alleges that Kedir misappropriated this document when she improperly acquired it by emailing it from Hightower's computer to her own email address. [1] ¶¶ 57–59. Misappropriation is the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by

24

improper means" such as breach of a duty to maintain secrecy or espionage through electronic or other means. 18 U.S.C. § 1839(5)–(6). Hightower presents evidence that Kedir had never previously sent this type of information to her personal email address, knew her act had no legitimate business purpose, and collected the information as part of her planning to leave Hightower and begin working at Steward. [40] at 122:15–22, 124:4–24. While the confidentiality provision in her employment contract may be unenforceable, Hightower also alleges that Kedir had a duty of loyalty to carry out her duties in good faith and not act to the detriment of her employer. [1] ¶¶ 64–66. When Kedir emailed this document to herself and then shared it with Steward, she likely breached this duty. Such a breach could constitute acquisition by "improper means." At this stage, Hightower has presented enough evidence to show a likelihood of success on at least one aspect of its trade secret claim.

### B. Irreparable Harm

Hightower must show that it will suffer irreparable injury without a preliminary injunction. *See Life Spine,* 8 F.4th at 545. "Harm is irreparable if legal remedies are . . . seriously deficient as compared to the harm suffered." *Id.* Hightower argues that Kedir's misappropriation of its strategies will cause lost revenue, loss of customer relationships, harm to customer goodwill, as well as threaten to damage Hightower's competitive advantage in the local marketplace. [45] at 15, 25–26.

Hightower emphasizes the amount of resources it spent in developing the allegedly misappropriated investment models and descriptions of funds held in those models. [38] at 139:21–140:2. But past costs do not demonstrate a future threat of irreparable harm. *See DM Trans, LLC v. Scott*, 38 F.4th 608, 621 (7th Cir. 2022).

25

Hightower must show that it *will* suffer irreparable harm in the absence of an injunction. *See id.* A "former employee's use of an employer's confidential information could support a finding of irreparable harm to the former employer. But there must be a causal mechanism to support such a finding." *Id.* When a former employer argues that the use of confidential information will cause lost profits or customer relationships, it "must show the lost profits or lost customer relationships cannot be calculated with any reasonable degree of certainty." *Id.*

Kedir argues that any use of confidential information in the future will relate to identifiable customers. [48] at 20. But that is not so clear. Hightower argues that Kedir has handed its competitor its "secret sauce," which could be used by Steward on accounts that are not identifiable and could be used to solicit new customers. [45] at 26. Not knowing how and with which customers Steward may use Hightower's investment strategies in the future makes it difficult to quantify damages.

Kedir argues that there must be limited harm to sharing the strategies because she has offered to return or destroy the information at issue, and Hightower has not responded. [48] at 19. This argument has some merit. *See DM Trans,* 38 F.4th at 622 ("[T]he company's claim that [defendants'] possession qualifie[d] as irreparable harm r[ang] hollow" when the company "failed to take basic steps to prevent the … defendants from possessing its purportedly confidential information," including refusing an offer to return or destroy the information at issue). But even if Kedir were to destroy or return the information, she undoubtedly will remember certain details about the strategies that she could employ while working for Steward.

26

This would result in the same, unquantifiable harms as if she were to retain the documents.

Hightower has sufficiently shown that it will suffer irreparable harm if Kedir is not enjoined from using the alleged trade secrets.

### C.    Balance of Equities and Public Interest

The injunction Hightower wants would restrain Kedir from disclosing or otherwise using Hightower's confidential information in any manner whatsoever; and would require she return all Hightower confidential information. [1] at 27; [45] at 16, 20–21. Kedir argues that granting the injunction will necessarily prohibit her from working in her field. [48] at 29. But an injunction centered on the allegedly misappropriated trade secrets won't do that—it will simply prevent her from using or sharing the one document containing Hightower investment models and descriptions of funds held in those models.

In contrast, Hightower faces the loss of its competitive edge and the loss of unidentifiable customers. Such harm to Hightower cannot be adequately remedied through monetary damages, even imprecisely. The balance of equities weighs in Hightower's favor. An injunction would also serve the public's interest in preventing unfair competition and in safeguarding trade secrets.

### IV.    Conclusion

Defendant's motion to dismiss plaintiffs' defamation claim, [21], is granted as to defendant's statements about her qualifications and in the Steward press release. Plaintiff's defamation claim based on defendant's statements regarding LBPWM's ownership and management survives. Plaintiff's motion for preliminary injunction,

27

[45], is granted as to the chart of Hightower's alternative investments and mutual funds held by Hightower's models. A separate injunction order will follow after the parties submit position papers on the amount of appropriate security under Fed. R. Civ. P. 65(c). The position papers are due July 18, 2024.

ENTER:

Manish S. Shah
United States District Judge

Date: July 11, 2024.